UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

IN RE:

TODD JAGIELLO

    Debtor.

_____/

Case No. 11-67954
Chapter 7
Hon. Walter Shapero

SANDY RAKICH,

    Plaintiff,

v.

TODD JAGIELLO,

    Defendant.

_____/

Adv. Pro. No. 12-04096

## OPINION DENYING DISCHARGEABILITY OF DEBT

This adversary proceeding was commenced by Sandy Rakich ("Plaintiff") to obtain a declaration that the debt owed to her by Todd Jagiello ("Defendant") is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6). Following a trial, the Court instructed the parties to submit post-trial briefs and closing arguments. For the reasons set forth herein, the Court concludes that the debt owed to Plaintiff by Defendant is not dischargeable.

### BACKGROUND FACTS

On April 29, 2006, Plaintiff entered into a written agreement ("Agreement") with Defendant, Erik Hebert ("Hebert"), and NOE Investments, Inc. (the "Company"). Hebert is Defendant's cousin. The Company is a Nevada corporation, which was incorporated by Hebert, who is the sole shareholder. The stated purpose of the Agreement was twofold: (1) Plaintiff

1

agreed to lend the sum of $280,000.00 to the Company, which would be repaid at the legal rate of interest, and Defendant and Hebert agreed to personally guaranty the loan; and (2) Plaintiff, who had recently taken an exam to become a licensed real estate agent, agreed to assist the Company from time to time during the next four years, at the discretion of the Company, in the purchase and sale of real property, with the services to be rendered and the compensation for such being subject to further negotiations. The Agreement set forth a four-year term for the repayment of the loan and included a merger or integration clause, which stated:

> This Agreement constitutes the sole and only Agreement of the parties hereto and correctly sets forth the rights, duties and obligations of each to the other as of its date. Any prior Agreements, promises, negotiations or representations concerning its subject no expressly set forth in this Agreement are of no force or effect.

Prior to the date of the Agreement, Plaintiff and Hebert were both living in California and were involved in a personal relationship. Defendant was living in Michigan, but was interested in moving to California. He had experience working as an employee of a contractor and then later as contractor in Michigan, and had most recently been hired by real estate investors to do construction work on "flip"[1] properties. Defendant and Hebert had discussed the possibility of getting involved together in the real estate business and were looking into investment opportunities. Defendant testified that he wanted to "flip" properties and/or buy rental properties in California and possibly other states.

Early in 2006, Hebert had learned of a potential project involving a property located in Long Beach, California, which was owned by one of his friends. The Long Beach property had an existing single family home on it, but it was zoned for multi-family use. There was a condominium unit next door to the property and the idea was to tear down the single family home on the property and to build a condominium unit similar to the unit next door (the "Long

Beach Project"). Hebert discussed the Long Beach Project with Defendant and they agreed that Hebert would begin to seek out potential investors for that project.

The parties' testimony differs significantly regarding the intent of the Agreement and whether the agreement covered only the Long Beach Project or multiple projects. Plaintiff asserts that her understanding of the Agreement was that it covered only the Long Beach Project and that the money she loaned to the Company would be used only for that project. She testified that: (a) Hebert approached her about investing in the Long Beach Project only and he indicated that he was seeking at least five other investors for that project; (b) Hebert told her that he and the Defendant would also be investing money in that project; (c) Hebert and Defendant told her that Defendant would be acting as the general contractor on that project; and (d) once the condominium units were built, she would act as the sellers' real estate agent and earn commissions on the sale of the condominium units. Defendant asserts that the purpose of the Agreement was to provide the Company with funds to seek out real estate investments, not limited to the Long Beach Project, and that the Agreement clearly expresses that purpose. Defendant also testified that (1) he did discuss with Plaintiff the possibility of getting involved in the Long Beach Project, but he also discussed the possibility of "flipping" other properties or investing in rental properties; (2) he never indicated that he would be investing money in the Company; and (3) Plaintiff would act as the real estate agent, at the discretion of the Company, for the sale of any properties owned by the Company.

The credible testimony is that Hebert himself discussed the Long Beach Project with Plaintiff at some point, and, after those initial discussions, Plaintiff, Defendant, and Hebert met at a restaurant to further discuss that investment opportunity. Plaintiff agreed to loan

---

[1] "Flip" in the context of this case generally means acquiring a property, possibly making some improvements or repairs, and then reselling it.

$280,000.00 to the Company, which she procured by taking out a mortgage on the house her mother was living in (which was titled in Plaintiff's name). Shortly thereafter, on April 29, 2006, the parties signed the Agreement. Plaintiff testified that she was unaware that the Defendant and Hebert were interested in investing in any other properties using her loan money, and as noted, thought it would be used to invest in the Long Beach Project. Defendant testified that Plaintiff was aware that he was interested in investing in other opportunities (in California, Texas, and Utah) in addition to the Long Beach Project and that Plaintiff accompanied him a few times when he went to look at other possible investment properties and for a personal residence in California. Plaintiff testified that she accompanied Defendant in his search for a personal residence in the Los Angeles area, but never for investment properties. Defendant apparently intended to purchase a personal residence in California, but he never actually did.

As to other specifics of the Long Beach Project, as Hebert himself essentially testified to, he became interested and involved in it early in 2006 thru a friend of his who, as noted, was the owner of the property. The project appears to have been primarily his idea and one that he took the lead in pursuing. It is likely Defendant did not personally become involved until later in that year. Initially an architect and maybe other professionals were hired (by Hebert or the owner of the property) and studies were done relative to the costs and feasibility of tearing down the existing dwelling and building the planned multiple unit dwelling. Slightly before or around the time Plaintiff came into the picture, an initial lower cost estimate Hebert had received was increased substantially. As to the status of that project, the Court concludes that, as of the time the Agreement was first discussed and at the time it was signed, it had already become readily apparent to Hebert and Defendant that (a) the Long Beach Project's estimated costs were about four or five times the $280,000.00 the Plaintiff was going to invest, (b) as of that time, other than

Plaintiff, no other "investors" had yet been found or had committed to the project, and neither Hebert nor Defendant themselves, individually or together, had sufficient, or any, funds of their own readily available to put into the project to meet its completion requirements, and (c) both Defendant and Hebert had essentially lost interest in further pursuing that particular project and were looking to, or thinking about, what they thought might be greener fields (using Plaintiff's money). As Defendant stated in his testimony, the real estate market in California was generally still strong and viable (though expensive), but the potential for lower initial investment and higher returns might be greater in other areas of the west such as Nevada or Utah.

Under the Agreement, in which Plaintiff was denoted as "Agent," (1) the money was lent to the Company, which had the primary obligation to repay the loan; (2) the purpose of the Agreement was "to provide [the] Company with the option to use Agent's services over the next four (4) years in real estate transactions and as a finder in referring real estate opportunities to [the]Company as well as to provide funds to [the] Company"; and (3) the "Agent also [agreed] to assist [the] Company from time to time in the purchase and sale of real property," etc.

Quite clearly, based on the language of the Agreement itself and the testimony, the Company, as a separate entity, was to be the focal point of the Agreement and the principal party in interest with regard to the loan. The Company was supposed to use of proceeds of the loan to enter into the real estate transactions contemplated by the Agreement, and it was to be the beneficiary of those transactions.

Thus, the existence and status of the Company is an important aspect of this proceeding. As to that, the Court concludes the facts are as follows: (a) the Company was incorporated in Nevada on April 24, 2006, by Hebert, who is listed as its Resident Agent with a Las Vegas street address (although he was apparently living in California at the time); (b) its initial capitalization was $2,000.00, it being unclear whether or not any stock certificates were ever in fact issued or

5

12-04096-wsd    Doc 45    Filed 08/08/13    Entered 08/08/13 14:36:14    Page 5 of 16

whether that rather small amount was paid into the entity by Hebert for that stock; (c) its sole initial shareholder was Hebert; (d) its charter was at some point revoked; (e) it appears, based on Defendant's Exhibit B, that its business license had at some point expired; (f) there is no evidence that it filed a list of its officers, which said exhibit indicates was due on May 31, 2006; (g) it never had a bank account and did not, itself as an entity, engage in any business or transactions contemplated by the Agreement, let alone any other transactions, within its stated purpose of "Real estate and inventions"; (h) it did not ever as an entity receive any of the monies that Plaintiff put into the project; (i) Defendant did not become and was not an officer or director of that entity; and (j) no corporate records, resolutions, tax returns, or any other such documentation was produced evidencing any corporate books, records, or activity relevant to this proceeding or its existence.

On May 24, 2006, at the direction of Defendant, Plaintiff wire transferred the $280,000.00 called for by the Agreement to a personal account of Defendant at Wells Fargo Bank, N.A. That money, as previously noted, was the net proceeds of a mortgage on the home her mother lived in, which was titled in Plaintiff's name. Defendant's personal account had balance of $100.00 prior to the $280,000.00 transfer. The $280,000.00 transfer posted to Defendant's account on May 25, 2006, and, shortly thereafter, Defendant transferred no less than $158,000.00 of those funds to Hebert personally. Hebert and Defendant testified that, after deciding that they would not be going forward with the Long Beach Project, they decided to diversify their investments using the funds loaned by Plaintiff and they made a business decision not to use the Company name for those investments. Hebert testified that he immediately invested the $158,000.00 that was transferred to him in a restaurant project he personally was involved in, which contemplated the renovation of a 3,000 sq. ft. Italian restaurant near a new

6

housing development in the Los Angeles area that was in the process of being built. The new housing development project was put on hold in June 2006, causing other investors to back out of the restaurant renovation project. Hebert testified that he also backed out of the restaurant renovation project in August or September 2006 because the people involved in the project kept asking him for additional capital. He lost all of the funds he invested and did not receive any return on his investment in that project. Hebert never personally made any loan repayments to Plaintiff.

In addition to transferring $158,000.00 to Hebert, Defendant also made a number of withdrawals and transfers from his account, including (1) on May 26, 2006, a $40,000.00 wire transfer to a personal account in the name of Robert Jagiello, Defendant's father, at LaSalle Bank (those funds later being transferred to Defendant's personal checking account at LaSalle Bank); (2) on August 14, 2006, a $30,000.00 transfer to an account held by Jagiello Properties, LLC, Michigan entity created by Defendant sometime in July 2006; and (3) numerous other cash withdrawals and check card purchases for hotels, restaurants, rental vehicles, and other expenses in California, Texas, and Utah. By September 2006, all of the $280,000.00 loan funds had been withdrawn or transferred from the Wells Fargo account. Between August and September 2006, Defendant still had the indicated funds in his Wells Fargo bank account; a nominal amount in his personal checking account; and approximately $30,000.00 in the Jagiello Properties account.

Defendant individually purchased, or attempted to purchase, several investment properties in Utah, which he planned to "flip" for profit. On July 14, 2006, Defendant's cousin and Eric Hebert's sister, Laura Hebert, purchased a property located at 337 West Royal Troon Drive, Heber City, Utah 48032. Defendant testified that Laura Hebert purchased that property at his direction, taking out a mortgage on the property in her name, and that he "flipped" it, using

7

funds from the loan made by Plaintiff for the renovation and carrying costs. That property was ultimately sold on December 27, 2006. Defendant did not keep records of the amount for which the property was originally purchased, the amount expended renovating the property, or the amount he received upon the sale of the property. Defendant testified that he made a profit on that investment, but couldn't say how much. During late August or early September 2006, Defendant also entered into purchase contracts and placed deposits on three properties in the Quail Ridge Subdivision in Morgan, Utah; those properties being located at 805 East Clover Way, Morgan, Utah; 782 North Sage Drive, Morgan, Utah; and 783 North Sage Drive, Morgan, Utah. Defendant testified that those properties were new construction properties and that his plan was to finish the landscaping and make certain upgrades to the homes, and then sell them. To finance the purchase of those properties, Defendant arranged to have one of the properties titled in his name, one titled in the name of his brother, Adam Jagiello, and one titled in the name of Laura Hebert. Defendant testified that, after entering into purchase agreements with the developer and making deposits of some $150.00 each, the development appreciated in value and the developer indicated that he no longer wanted to honor those purchase agreements. A legal dispute between Defendant and the developer began shortly thereafter and Defendant retained an attorney to assist him in a resolution. Defendant testified that, due to complications with the developer, he was only able to purchase the property located at 783 North Sage Drive, Morgan, Utah. Defendant testified that he purchased that property using a $200,000.00 loan he received from his mother. The property was sold in a much later time frame than initially expected, on February 16, 2008, for $230,000.00. Again, Defendant did not keep records of the amounts expended in the renovation of that property or his legal fees from his dispute with the developer

8

and he was uncertain whether he realized any profit from the sale of that property. Defendant testified that he repaid the loan made by his mother with the proceeds of that sale.

Defendant made seven separate loan payments to Plaintiff, totaling $24,787.00, on July 10, 2006; August 1, 2006; September 1, 2006; October 1, 2006; November 1, 2006; January 1, 2007; February 1, 2007; and April 1, 2007, but no further payments were made.

On May 21, 2008, Plaintiff received a Judgment against Defendant in the Superior Court, Los Angeles County, California, Case No. SC-095225, in the amount of $342,594.41. On January 9, 2009, the 3rd Judicial Circuit Court of Michigan entered an Affidavit and Notice of Entry of Foreign Judgment recognizing that Judgment.

Defendant filed his Chapter 7 bankruptcy petition on October 28, 2011. On his Schedule F, Debtor listed a debt owing to Plaintiff in the amount of $345,000.00 for a personal loan and, on his Statement of Financial Affairs, he disclosed the above referred to lawsuit and Judgment. On January 17, 2012, Plaintiff initiated the present adversary proceeding by filing a Complaint seeking a declaration that the debt owed to her by Defendant is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). Plaintiff later withdrew her 11 U.S.C. § 523(a)(4) claim.

## II.    DISCUSSION

### A. 11 U.S.C. § 523(a)(2)(A)

11 U.S.C. § 523(a)(2)(A) provides that:

(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –

>  (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

9

12-04096-wsd    Doc 45    Filed 08/08/13    Entered 08/08/13 14:36:14    Page 9 of 16

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

Section 523(a)(2)(A) is thus phrased in the disjunctive, meaning that false pretenses, false representation and actual fraud are three separate grounds for nondischargeability. *Mellon Bank, NA v. Vitanovich* (*In re Vitanovich*), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001); *JGR Assocs., LLC v. Brown* (*In re Brown*), 442 B.R. 585, 600 (Bankr. E.D. Mich. 2011); *Morganroth & Morganroth, PLLC v. Stollman* (*In re Stollman*), 404 B.R. 244, 257 (Bankr. E.D. Mich. 2009). A Bankruptcy Appellate Panel for the Sixth Circuit adopted the Seventh Circuit Court of Appeal's position in *McClellan v. Cantrell,* 217 F.3d 890 (7th Cir. 2000), "that [§ ] 523(a)(2)(A) is not limited to misrepresentations and misleading omissions." *Vitanovich,* 259 B.R. at 877 (quoting *McClellan,* 217 F.3d at 893).[2]

The Court tends to believe Plaintiff as to the substance of the representations she claims were made and, in particular, her testimony regarding (1) the focus of the Agreement, based on her discussions with Defendant and Hebert, being the Long Beach Project; (2) the status of the Long Beach Project at the time the Agreement was being discussed and at the time it was entered into; (3) her intentions to stay in California, and, as a recently licensed real estate agent, to associate with a California broker in order to allow her to work in real estate sales; and (4) an inducing consideration for her in entering into the Agreement was the possibility of her acting as the real estate agent in the sale of the completed Long Beach Project units. There are, however,

---

[2] In *Vitanovich*, 259 B.R. at 877 (internal punctuation marks, quotations, and citations omitted), the court explained:

> By distinguishing between a false representation and actual fraud, the statute makes clear that actual fraud is broader than misrepresentation. *McClellan* acknowledges that many cases have assumed that actual fraud involves a misrepresentation. However, such a restricted definition is not required, as actual fraud encompasses any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.

10

12-04096-wsd    Doc 45    Filed 08/08/13    Entered 08/08/13 14:36:14    Page 10 of 16

other aspects of the language of the Agreement and other facts that are relevant with regard to what must be shown by the Plaintiff to prevail in a case based on false representations under § 523(a)(2)(A). While such a case might be made, in the Court's view, this is a case that can better be decided and properly disposed of as an "actual fraud" case, encompassing, as the Court has noted, whether or not there was deceit, artifice, trick or design involving direct and active operation of the mind used by Defendant to circumvent and cheat Plaintiff.

Actual Fraud and False Pretenses

"When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *Vitanovich,* 259 B.R. at 877. To establish "actual fraud," Plaintiff must show (1) a course of conduct intended to deceive; (2) justifiable reliance; and (3) proximate causation. *Brown,* 442 B.R. at 600 (citing *Field v. Mans,* 516 U.S. 59, 69 (1995)).

As noted in detail, once Plaintiff's money was received, the account records and the recited facts in sum show that (1) Defendant, in very short order, transferred a total of $158,000.00 to Hebert personally, who testified that he invested those funds into the restaurant renovation project; and (2) Defendant made various transfers to other personal accounts he owned and to the Jagiello Properties, Inc. account, and Defendant testified that he used funds from those accounts to renovate and upgrade the two properties he "flipped" in Utah. Defendant also testified that he paid the down payments on the other two Utah properties and the legal fees associated with the dispute with the developer regarding the purchase agreements.

From the foregoing and the other surrounding facts the Court concludes that (1) the formation of the Company was essentially a window dressing created to be able to show only that such an entity actually existed, in case anyone asked about it; (2) it was never intended that

it would have any substance or role, or that it would operate or carry out the purposes of the Agreement (or likely be used for any other purpose), as was clearly contemplated it would do by the language of that Agreement; (3) if there was ever any other purpose or need for that entity, it was to serve the personal or business purposes of Hebert. That these factual conclusions are appropriate is buttressed by the testimony and demeanor of Hebert himself, which, as viewed by the Court, reflected an attitude of disdain, or if not that, what might be termed a form of financial amorality or attitude of unimportance or lack of appreciation when it came to such things as (a) observing the distinctness between a corporate entity and its shareholder, (b) proper accounting and record keeping, (c) filing tax returns, (d) observing ordinary commercial practices and rules and requirements relative to proper documentation of transactions, and (e) other such things as were likely the subject of, and taught him in, his college classes in entrepreneurship and marketing. He seemed to believe that such things were just bothersome or technical niceties that could either be initially ignored or later, and after the fact, easily manipulated or corrected if the need arose.

    Defendant and Hebert were then young, ambitious, and relatively inexperienced, but eager to become part of what appeared to them to be a scene where similarly motivated and situated folks were apparently making a lot of money in the real estate business. Plaintiff, just as young, even more inexperienced, somewhat naive, and less sophisticated, a teacher and in a personal relationship with Hebert, whom she appears to have trusted, was to be sure, not above desiring to become part of the same scene. She had substantial student loan debt to pay off, and her overall situation was susceptible to some sort of scheme or arrangement that might help her better herself financially and otherwise. That such was the case does not, however, preclude her from prevailing in this proceeding. She had known Defendant for a short time, having been introduced to him by Hebert, who touted what Defendant might bring to the arrangement. Plaintiff was put under pressure by

12

them to produce the funds in a very short and hurried-up time frame, and to enter into the Agreement, which was apparently drafted by an attorney obtained by Hebert to represent his and Defendant's interests, in a time frame and under circumstances in which she at least felt precluded her from obtaining her own attorney. This situation put a premium on her trust of Hebert - a trust which he essentially took undue advantage of at the time the Agreement was discussed and signed. The Agreement itself talked about Plaintiff being a "broker," which was incorrect, and was otherwise vague and incomplete, given the nature of extent of the transaction and the amounts and responsibilities involved. It also contained a so-called integration or merger clause, which will be hereinafter discussed, but which, on its face at least, purports to vitiate the very misrepresentations and actions Plaintiff claims Hebert and Defendant were contemporaneously making and actions they intended to engage (or not engage) in. However optimistic or straight forward Defendant's and Hebert's intentions and goals initially may have been regarding the Long Beach Project (or seeking other real estate investments) using funds borrowed from Plaintiff and using the Company as the vehicle through which they would be achieved, by the time the Agreement was to be signed and the funds advanced, it was apparent they were not reasonably capable of being fulfilled at all or at the least in a manner that could have produced income from those investments necessary to repay the loan according to its terms (or provide the contemplated sales opportunities incident to which Plaintiff could earn commissions). However, the immediate availability of the funds from Plaintiff offered a temptation Hebert and Defendant could not resist or forego, so they went forward with the transaction.

When you add together (a) the recited facts and conclusions as respects the Company; (b) the facts surrounding the formation and entering into the Agreement itself; (c) what actually happened to the money soon after it was paid in by Plaintiff, i.e.: to whom it was actually paid over to, what it was used for, and by whom it was used; and (d) the exclusion of Plaintiff from the process, i.e.: given the nature and uses of the monies, she did not and likely could not have provided services as or

benefitted as an agent or broker in connection with any of the actual transactions that took place, despite the fact that such was one of the "purposes" of the Agreement; the Court concludes that what was involved here was a scheme and artifice to obtain the funds from Plaintiff in order to use them, not for what the Agreement initially contemplated (more likely particularly the Long Beach Project but even arguably other transactions as well), but for Hebert and Defendant's personal and separate uses, projects, or investments. The Court concludes that this was their intention certainly as of the date the Agreement was signed (and maybe before), in the apparent hope that in doing so they might benefit to the extent that they would be able to make the payments to Plaintiff required and guaranteed by the Agreement - payments that to the limited extent made, were made were entirely made from the funds she had paid in and not from any transactions entered into by Hebert or Defendant that produced any income or funds which could have been available to repay the obligation.

In the Court's view, the facts support a conclusion that Plaintiff's funds were obtained by way of deceit, artifice, trick or design involving direct and active operation of Defendant and Hebert's minds, with the result of essentially cheating Plaintiff out of her money, for their own personal purposes.

Given the recited facts, it cannot be seriously questioned that the other required elements of justifiable reliance and causation exist.

It is to be also noted that § 523(a)(2)(A) encompasses a debt for money to the extent obtained by "false pretenses." As the Courts have concluded, that is separate and distinct from the "false representation" and "actual fraud" portions of that statute.

> "As used in Section 523(a)(2)(A), 'false pretenses' means implied misrepresentations or conduct intended to create and foster a false impression." *In re Bozzano,* 173 B.R. 990, 993 (Bankr. M.D. N.C. 1994) (and cases cited therein). Moreover, "[a] 'false pretense' is established or fostered willfully, knowingly and by design; it is not the result of inadvertence." *In re Dunston,* 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part, rev'd in part,* 146 B.R. 269 (D. Colo. 1992).
>
> "False pretenses" for purposes of Section 523(a)(2)(A) then may be defined as conscious deceptive or misleading conduct calculated to obtain, or deprive

14

another of, property. It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective.

*In re Kovler*, 249 B.R. 238, 261 (Bankr. S.D. N.Y. 2000) *supplemented,* 253 B.R. 592 (Bankr. S.D. N.Y. 2000) and *corrected,* 329 B.R. 17 (Bankr. S.D. N.Y. 2005).

The legal difference between "false pretenses" and "actual fraud" is thus a somewhat subtle and indistinct one, given the above recited definitions of the former, and the analysis of the latter in this Court's formulating its conclusion in this case. There appears to be some overlap. That said, the Court concludes that the facts of both exist in this proceeding.

Defendant puts a great deal of emphasis on (1) the wording of the Agreement itself, as such may refer or imply contemplation of transactions other than the Long Beach Property, (2) the effect of merger or integration clause in the Agreement, and (3) that, in his mind, what is involved here is nothing more than breach of contract.

As to (3), an unfulfilled promise can be actual fraud if there is evidence that the promise was made with a present undisclosed intent not to perform, or it was made for the purpose of deceiving the promisee or inducing that person to act, or made in bad faith. The Court believes that given the recited facts, that test is satisfied.

As to (1), there are words in the Agreement that do say or imply that, but that is not decisive.

As to (2), the Court is not deciding this case on the basis of claimed false representations, which might be affected by the merger clause. Moreover, such clauses may not be operative in the presence of false representations made as to matters outside the contractual terms, which constitutes fraud in the inducement. *See Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F.Supp.2d 927 (E.D. Mich 2005). In this case that might be, for instance, representations about getting or having Hebert and Defendant as investors, and/or getting other investors necessary to fund the Long Beach Project.

15

12-04096-wsd    Doc 45    Filed 08/08/13    Entered 08/08/13 14:36:14    Page 15 of 16

In a way, Defendant seeks to separate himself from Hebert, essentially arguing that Hebert was the primary and dominant actor in this situation, and Defendant should not be tarred with, or held accountable for, any of his actions. The Agreement itself makes no such distinctions and in fact indicates and implies that they were co-equal venturors, and certainly joint obligors to Plaintiff. The evidence does indicate that they were intending to play different roles in at least some "flip" projects and the Long Beach Project, though those roles were not always different or distinct, given the transactions that Defendant entered into Utah for instance, where he was the dominant and moving party. That co-venturers bring different skills to the table is par for the course and often true in many a venture, and indeed what might permit them to become successful. If and to the extent Hebert played a more dominant role, it was because Defendant acquiesced in and was willing to accept that in their relationship. In any event, such cannot exculpate Defendant from the consequences of what clearly was a joint venture or partner like arrangement, as between Hebert and Defendant on the one hand and Plaintiff on the other.

For the foregoing reasons, the Court concludes the subject debt is not dischargeable under 11 U.S.C. § 523(a)(2)(A), and given that conclusion need not decide the issue under 11 U.S.C. § 523(a)(6).

Counsel for Plaintiff shall prepare and present an appropriate order.

.

**Signed on August 08, 2013**

                                               **/s/ Walter Shapero**
                                         **Walter Shapero**
                                         **United States Bankruptcy Judge**